Russell Greer
c/o A Safer Nevada PAC
10409 Pacific Palisades Ave
Las Vegas, NV 89144
contact@asafernevada.org
801-895-3501
Pro Se Litigant
L

## IN THE U.S. DISTRICT COURT

## OF NEVADA

| | |
|---|---|
| **RUSSELL GREER,** an individual,<br><br>    Plaintiff<br><br>v.<br><br>**FRANCISCO V. AGUILAR,** in his official capacity as the Secretary of State of Nevada,<br><br>    Defendant | **PLAINTIFF'S [PROPOSED] THIRD AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF**<br><br><br><br>Case No.:   2:25-cv-02581-JAD-BNW<br><br><br><br>District Judge: Jennifer A. Dorsey<br><br>Magistrate Judge: Brenda Weksler |

1

## INTRODUCTION

1. This action challenges Nevada's arbitrary and burdensome requirement that five qualified electors of a city or county sponsor a local ballot initiative petition before circulation may begin, whereas only one person may initiate a statewide petition. This disparate treatment violates the First and Fourteenth Amendments to the U.S. Constitution and Article 19 of the Nevada Constitution.

2. This action presents an as-applied constitutional challenge to the sponsor-threshold provisions of NRS 295.095(1) and NRS 295.205(1).

3. Plaintiff does not challenge the remaining procedural requirements governing initiative petitions, but seeks declaratory and injunctive relief limited to the five-person requirement as applied to the initiation of county and city initiative petitions.

4. Plaintiff respectfully requests ***expedited resolution of this matter by early March 2026***, so that signature gathering may begin in spring 2026, to qualify for the November 2026 general election ballot.

## JURISDICTION AND VENUE

5 . This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

6. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343.5.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the events at issue occurred in Nevada.

## PARTIES

8. Plaintiff Russell Greer is a Nevada resident and the founder of A Safer Nevada PAC. The PAC's goals are to expand prostitution legality throughout Nevada through ballot initiative.

9. Defendant Francisco Aguilar is the Secretary of State of Nevada and, in his official capacity, is charged with administering, supervising, and enforcing Nevada's initiative petition statutes.

10. Defendant is sued in his official capacity for prospective declaratory and injunctive relief only.

## FACTUAL BACKGROUND

### A.   Statutory Framework Governing Initiative Sponsorship

11.  Article 19 of the Nevada Constitution reserves the initiative power to the People and is self-executing.

12.  NRS 295.015(1) permits a single sponsor to initiate a statewide ballot measure.

13. By contrast, NRS 295.095(1) and NRS 295.205(1) require five qualified electors from the specific city or county to serve as public sponsors before a local initiative petition may even be circulated.

### B. Plaintiff's Continuous Multi-Year Efforts to Initiate Local Petitions (2021–2026)

14.  Since early 2021, Plaintiff has repeatedly attempted to initiate local initiative petitions in multiple Nevada jurisdictions, including Winnemucca, Eureka County, West Wendover, and Clark County.

15.  Despite years of effort, he has been completely unable to satisfy the five-sponsor requirement — solely because residents are unwilling to publicly attach their names to a **taboo subject, even if they privately support legalization of prostitution.**.

16.  In 2022, Plaintiff secured volunteer assistance from the University of Nevada, Reno through its civic engagement program. His PAC had partnered with UNR. Several students wanted to volunteer, including a student named Chiara. **EXHIBIT A.**

17. These volunteers conducted independent telephone calls and attempted to contact dozens of local residents, mainly in West Wendover — a border town that sits on the Utah border and has large casinos.

18.   One of Chiara's call logs from 2022 reflects repeated failed attempts to reach or persuade potential supporters. For instance, one log shows she called 33 West Wendover residents. Her notes reflect unanswered calls, voicemail boxes not set up, numbers no longer in service, language barriers, individuals hanging up immediately, and residents expressly declining participation. From that list, she did find one resident, who expressed interest, but that resident's husband ended up getting a job in Utah and they moved out of West Wendover. Another log had Chiara call 70 people with little success. **EXHIBIT B. The exhibit shows that it was created in 2022, proving authenticity.**

19.   Plaintiff, himself, also conducted extensive written outreach. For example, on December 12, 2023, Plaintiff sent approximately 18 emails to Winnemucca residents seeking sponsorship support. **EXHIBIT C.** No one ever replied. It's unsure if his messages were received or went to spam.

20.   Additional outreach was sent to former candidates, local civic groups, community members listed on Secretary of State filings, and individuals with prior political involvement in their towns and only two replied: one person said they moved out of Nevada; another said her group had voted internally on whether to support decriminalization of sex work and they said their group narrowly voted not to support sex work. **EXHIBIT D.**

21.   Plaintiff *DID* connect with a leadership member of a state political party, **M.,** who said she knew people in every locale Greer was trying to do ballot initiatives in and she said she could get them to sign. **EXHIBIT E.**

22.   **M.** ended up not delivering on her promises, citing health reasons.

23.   Through 2022 through 2024, Plaintiff also messaged dozens of residents through social media platforms in multiple counties, asking if they would serve as sponsors. These efforts produced a few conversations, but no willing public sponsors. Many of the messages weren't even "read." **EXHIBIT F.**

4

24. Through his Facebook canvassing, he did connect with another woman named **H**., who said she would help, but for some reason, she too didn't move forward. She cited depression.

**EXHIBIT G.**

25. In 2024, Plaintiff located a resident in one of his targeted jurisdictions, **A.,** who initially agreed to serve as a sponsor and to recruit four additional local electors; however, after facing community pressure and fear of gossip, she withdrew her support. Her withdrawal collapsed the initiative effort entirely.

## C. Chilling Effect & Strangers Don't Reply to Strangers

26. This lack of rounding up 5 residents should not be confused with lack of local or grassroots support. Many residents indicated they agreed with the reform itself but were unwilling to serve as *public* sponsors because doing so would expose them personally to scrutiny or backlash.

27. Plaintiff found another person, a school administrator, who explicitly stated that although he agreed with the policy, he could not be publicly listed as a sponsor because it could jeopardize his employment.

28. In total, from 2022-2024, between Greer's messages and his interns' calls, hundreds of messages were sent to different voters, with the main result that many were simply not answering.

29. The simple reality is this: strangers don't reply to strangers.

30. If an unknown number calls, people do not answer.

31. If an unknown person sends a person a connection request online, most of the time, it's not accepted.

32. Online messages are usually landing in "other" or "spam" folders.

33. That's just the reality of online networking in 2026.

34. This is why mainstream voter call centers for national candidates have hundreds of people calling, so that they increase the odds of reaching voters.

35.  Having a one hundred person call center bank just simply isn't realistic for sex work, es racially when it's unpaid.

**D. Disability-Related Barriers**

34.  To hinder his efforts further, Plaintiff has Moebius Syndrome, which causes facial paralysis and affects speech clarity. Many people have described Greer's speech as either "slurred" or "having a deaf accent".

35.  As a result, Plaintiff cannot rely on telephone persuasion to the same degree as others, and often must communicate through written outreach. This disability magnifies the chilling effect as stated above of people simply not seeing or ignoring messages from strangers.

36. This is why Plaintiff attempted to mitigate the disability-related barrier by using UNR volunteers and other third parties to make calls on his behalf.

37. Despite this, volunteers encountered the same patterns of people not answering or numbers being out of order, demonstrating that the 5 person barrier is not unique to Plaintiff, but systemic and the procedure only really works for church groups, civic groups or people who truly trust and know each other, and who are trying to place a ***non-controversial measure, e.g. taxes, schools, health care.***

**E. Exhaustion of Alternative Avenues**

38.  Seeing that he was running into this barrier with finding 5 people, Plaintiff approached the City Council of West Wendover in 2024 and requested that the brothel question be placed on the ballot as a nonbinding advisory question.

39.  The Mayor refused to allow even an advisory vote, writing, "I also didn't make the state laws you find unrealistic."  **EXHIBIT H.** This was in response to Plaintiff writing on June 27, 2024, "State law just has an unrealistic expectation of requiring 5 voters to publicly list their names on an affidavit to even jumpstart the process."

6

40. This evidence reinforces that without satisfying the five-sponsor requirement, Plaintiff has no method to allow voters to consider the policy question.

**F. Clark Locals Quietly Support**

41. Plaintiff has sought to initiate a countywide "trigger law" petition in Clark County in 2026, but again when he connects with friends or groups that support, they want to stay hidden.

42. For instance, in 2022, Greer connected with a couple (**The Ws**) who run a swingers club in Clark, which they call a "lifestyle club".

43. The lifestyle club initially was going to support a Clark initiative, but they claimed Clark County found out and threatened the club with legal repercussions. **EXHIBIT I.**

44. Plaintiff did connect with a UNLV student group that was interested in progressive legislation. Greer met with its leader, Tyler, in 2021 and he, too, disappeared soon after. **EXHIBIT J.**

45. Greer wrote to the Clark County Democrat Party and the Clark County Libertarian Party in 2021 and 2023 and was again met with silence. He did get in touch with the National Libertarian Party and the Los Angeles Libertarian Party in 2021 and their support went nowhere. **EXHIBIT K.**

46. Greer has met people who support legalization in Clark, but who will not attach their names.

47. Greer can't just get a group of 5 sex workers in brothels to do the initiatives because many are not Nevada residents and the brothel owners do not reply. Many brothel owners are private individuals, who sit behind their LLCs.

**G. Continuing Harm and the Statutory Barrier**

48. Over four years, Plaintiff has exhausted practical means of identifying five willing public sponsors. He has used volunteers, social media, email outreach, contacted former candidates of political parties, civic organization contacts and in-person approaches.

49. None have produced the required five sponsors in any jurisdiction for this sole reason: **people support sex work reform (privately), but when it comes to being a public sponsor, they fear their reputations. Rightly so.**

50. Plaintiff himself has lost friends and opportunities for support for sex work, so it's understandable that people in these small communities would fear the same backlash.

51. The five-elector requirement has prevented Plaintiff from circulating a petition in 2022, 2024, and again in 2026, despite substantial local interest in allowing voters to decide the issue directly.

52.  Essentially, Plaintiff is stuck in a catch-22: voters support brothel legalization, but won't publicly attach their names.

52.  As a Nevada voter and a natural person, Plaintiff is fully qualified to initiate statewide petitions on his own signature, yet he is categorically blocked from initiating local petitions solely because of the five person, locality requirement.

## CLAIMS FOR RELIEF

### Count I – First Amendment (U.S. Const. amend. I)

53. Plaintiff incorporates by reference paragraphs 1–52.

### Core Political Speech and the Governing Legal Test (Meyer, Pierce, and Angle)

54.   The circulation and sponsorship of initiative petitions constitute "core political speech" entitled to the highest level of First Amendment protection. *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988).

55.   In *Meyer*, the Supreme Court identified *two non-exhaustive* considerations that aid in determining whether a regulation of the initiative process imposes such a severe burden on core political speech that it triggers strict scrutiny.

56.   (1) whether a restriction reduces the number of voices capable of communicating political ideas.

8

57. (2) whether the restriction makes it less likely proponents will obtain sufficient signatures to place an initiative on the ballot. *Id.*

58. The Ninth Circuit recently clarified in *Pierce v. Jacobsen* that restrictions which *prevent circulation from beginning at all* impose a severe burden requiring strict scrutiny. *Pierce v. Jacobsen*, 44 F. 4th 853 (9th 2022).

59. If a law conditions whether circulation may occur, the burden reaches the highest constitutional tier. *Id.*

60. The *Pierce* court held that even when a plaintiff has "bare speculation," a law can be unconstitutional if it diminishes the pool of circulators.

61. Lastly, *Pierce* held that this holding applied to both initiative petitions and candidate petitions alike. Therefore, the restrictions on circulators and proponents should be "treated similarly." *Id.*

**I. First Part of the *Meyer* Test**

**A. The Statutes Reduce the Number of Voices**

62. The Supreme Court has repeatedly held that restrictions reducing "the number of voices" who may convey political messages impose a severe First Amendment burden. *Meyer*, 486 U.S. at 422–23.

63. The Ninth Circuit similarly recognizes that residency limitations shrink the "pool of circulators" and therefore burden political expression. *Nader v. Brewer*, 531 F.3d 1028, 1035–39 (9th Cir. 2008).

64. As applied here, limiting sponsorship to **five local residents** not only reduces the pool of speakers, it reduces it to zero — in practice — for Plaintiff and for those proposing controversial reform.

65. Because the restriction eliminates Plaintiff's ability to introduce his measure at all unless others expose themselves publicly, it directly diminishes the "total quantum of political speech" in the community.

**B. Nevada's Five-Sponsor Rule Fails the Meyer–Pierce Framework Because It Is a Pre-Circulation Ban & Reduces Voices**

66. NRS 295.095(1) and 295.205(1) require Plaintiff to obtain the public signatures of five local electors before a petition may even be circulated.

67. This pre-filing sponsorship condition blocks circulation at the outset, creating the exact type of barrier *Meyer* and *Pierce* identify as severe.

68. The rule prevents Plaintiff from engaging in core political expression, unless he convinces others to expose themselves publicly and absorb reputational, employment, and safety risks — a condition wholly unrelated to voter support.

69. As a Nevada registered voter, Plaintiff desires to be the sole proponent on many local brothel ballot initiatives because he has drafted truly progressive ordinances that could change public perception on brothels. He also desires to be the sole proponent, so that circulation may commence faster, instead of having to organize five strangers to jumpstart the initiatives.

70. Because he is not a registered voter in West Wendover, Eureka County, Washoe County and Winnemucca, Plaintiff's only way of circulating these initiatives is by organizing five strangers and if even one drops out, the initiative collapses.

71. By excluding electors who live outside the locality, compelling public disclosure, and conditioning Plaintiff's speech on others' willingness to take personal risks, the statute dramatically shrinks the available pool of speakers.

72. The statutes don't just limit based on voter registration address, they also limit numerically. Even when Greer found "A." in West Wendover, she still had to find other *registered voters (*see her email asking if they had to be registered to vote in West Wendover).

10

73. If the law had been written as only one resident needing to jumpstart a local initiative, "A" could have filed the initiative, but she she still had to find 4 other registered voters.

74. Under *Meyer*, *Buckley*, *Nader*, and *Pierce*, such restrictions constitute severe burdens triggering strict scrutiny.

**C. The Statutes Disproportionately Burden Stigmatized Viewpoints**

75. To put this difficulty into perspective: anti-brothel advocates in Lyon (2018), Nye (2018), Lincoln (1978), and Churchill (2004) Counties have previously been able to place anti-brothel measures on local ballots — not because their initiatives were popular — but because their supporters belonged to church networks and religiously aligned communities that provide built-in reinforcement and trust.

76. These groups can easily identify five willing public sponsors because participation carries no reputational or professional risk within their circles or their employers.

77. These church-based coalitions operate as echo chambers: members meet regularly, share identical ideological commitments, and encourage one another's participation.

78. Public sponsorship is socially safe because if they get harassing mails, they don't drop out because they're reinforced by religious beliefs and by other religious members. As a result, the statutory requirement is trivially easy for them to satisfy.

79. Plaintiff, by contrast, has no access to cohesive or mutually reinforcing communities.

80. There are no other major sex work groups in Nevada. Because Nevada sex workers are independent contractors, they can't unionize.

81. Greer spent 2021-2023 contacting progressive organizations like the ACLU, TIDES, etc and none offered help. Their responses were to start small with small initiatives and to get back to them if Greer succeeded small — but he can't even do that because of the statutes. **EXHIBIT L.**

82. Individuals who support sex-work reform are isolated, cautious, and unable to depend on group-based protection. Their support exists privately, not publicly, and they face genuine

risks—employment, social stigma, and community backlash—if they attach their names to a petition.

83. Without a comparable echo chamber, Plaintiff cannot recruit even a handful of public sponsors, despite extensive multi-year outreach.

84. Plaintiff attempted to locate a group that might function comparably to a church network by approaching a lifestyle club ("the Ws") in Clark County.

85. This community was one of the few environments where Plaintiff believed members might share a common identity and provide reinforcement to one another. Initially, the club's leadership expressed support and indicated they could connect Plaintiff with prospective sponsors.

86. The lifestyle club, however, abruptly withdrew after reporting that Clark County officials had allegedly contacted or discouraged them from assisting.

87. Unlike church networks, Plaintiff's supporters lack insulation, social protection, or group reinforcement.

**D. Evidence of Being Targeted for Advocating for Sex Work**

88. Plaintiff has evidence of being targeted for advocating for sex work.

89. Since 2017, Plaintiff has been cyber stalked by a website that dislikes him because he supports legal brothels. Many of these users do not reside in Nevada.

90. In December 2025, one of the users going by the name Elijah Edwards (elijahedwards540@gmail.com) sent Greer and an acquaintance the following message. "We are watching you two. All your families, friends, coworkers and neighbors are being contacted to tell them about your prostitution activities." **EXHIBIT M.**

91. Greer knows Elijah Edwards and others on the stalking site will do the same thing to 5 voters who launch his initiatives.

92. Greer had to contact a district attorney in one of his planned filing jurisdictions to see if they would take action against anyone who intimidates voters.

93. Greer has had hostile experiences in-person from advocating for sex work.

94. In February 2024, when Plaintiff submitted a routine agenda request to update a prostitution ordinance in Esmeralda County —without advertising the meeting or contacting any residents— word spread rapidly through the community. **EXHIBIT O.**

95. Residents who follow county agendas and minutes, closely filled the commission chambers in strong opposition. Plaintiff's appearance triggered an unexpectedly hostile crowd solely because the topic appeared on the public agenda.

96. This incident demonstrates that in rural Nevada, engagement with sex-work policy immediately exposes individuals to intense public scrutiny.

97. Residents monitor agendas "like hawks," and any public association with prostitution reform becomes visible, controversial, and reputationally dangerous within hours.

98. Rational supporters of sex work—especially those without cohesive communities behind them—will predictably refuse to attach their names to public affidavits under such conditions.

99.  This same pattern is observed with initiative filings.

100.  State initiative petition C-07-2026 was filed 01-08-2026.

101.  Immediately on 01-29-2026, the initiative was challenged in court, proving that people DO watch filings, proving that what Greer is saying that people are scared of being targeted is not speculation. **EXHIBIT O.**

101.  The voters' concerns about being "doxxed" are reinforced by Greer's lived experiences and by the objective evidence of people monitoring anything initiative or legislative.

102 . Nevada's five-sponsor rule is not viewpoint neutral in operation. It rewards groups that already possess built-in echo chambers and social reinforcement, while it disproportionately burdens individuals advocating stigmatized reforms.

103. Accordingly, the first part of the Meyer test is met.

## II. Second Part of the *Meyer Test*

104. Greer repeats his evidence, as found in his factual allegations, below.

## A. Plaintiff's Real-World Experience Confirms the Rule's Severe Burden

105.  Since 2022, Plaintiff has made **_hundreds_** of attempts to identify five willing public sponsors across multiple Nevada localities. His efforts include:

- Direct messaging dozens of residents in Winnemucca, West Wendover, Eureka County, Washoe County, and Clark County on social media;

- Sending **18 emails in a single day** (December 12, 2023) to Winnemucca residents seeking sponsorship support;

- Contacting former candidates and individuals identified through Secretary of State records;

- Partnering with the University of Nevada–Reno's civic engagement program, where volunteers attempted to telephone hundreds of potential supporters;

- Reaching out to resident H., who privately supported Plaintiff, but ultimately declined due to fear and depression;

- Connecting with resident A., who initially agreed to recruit four additional sponsors but withdrew after community pressure and reputational fears;

- Connecting with another West Wendover local, who ended up moving to Utah;

- Communicating with an Elko County school administrator, who explicitly said he supported the policy, but could not appear publicly because it threatened his employment;

- Contacting leadership in multiple political parties; and

- Chiara, the UNR intern, whose call logs documented unanswered numbers, disconnected numbers, voicemail boxes not set up, immediate hang-ups, and express refusals.

14

106.    Interns experienced the **same patterns** Plaintiff encountered: nearly all outreach attempts failed and even willing supporters refused to attach their names publicly.

107.   Plaintiff also faces disability-related barriers. Due to Moebius Syndrome, Plaintiff's speech is often misunderstood because he can't close his lips, limiting his ability to successfully conduct cold-call political outreach. This requires him to rely more heavily on written communication, which is often ignored, filtered as spam, or left unread.

108.  These facts demonstrate that Plaintiff is not experiencing isolated or low obstacles. The combination of residency limitations, compelled public identification, stigma surrounding sex-work-related policy, and interpersonal dynamics in small communities **prevents reasonably diligent initiative proponents from satisfying the five-sponsor requirement.**

109.  The burden of the challenged statutes is particularly severe for controversial or taboo measures—i.e., the very measures that often require direct democracy to bypass entrenched political resistance.

110.  The statutes make it less likely that proponents of sex work measures will qualify for the ballot.

111.  This is also evidenced by the fact that no other groups except 1982 have put pro-brothel measures on a county ballot. The 1982 group proponents were Lincoln County brothel owners who had their brothels voted out of existence in 1978 and they were trying to reverse the vote.

112.  The 1982 efforts should be the exception to the rule because those proponents had the money and the local connections — they weren't cold calling people like plaintiff is.

113.  Since 1982, nobody else has successfully put a pro-brothel measure on a ballot. See *Pierce* (finding a Montana law unconstitutional, despite 14 other initiatives qualifying).

114. Thus, the second prong of the *Meyer* test is met.

**B. Nevada's Five-Sponsor Requirement Is Not Narrowly Tailored and Is Unsupported by Precedent**

15

115.  Supporting the Meyer test, the Nevada's five-sponsor requirement is not narrowly tailored to any legitimate governmental interest traditionally recognized in initiative-process jurisprudence, such as fraud prevention, signature integrity, or circulator accountability.

116.  Existing statutory protections—circulator affidavits, signature verification, and criminal penalties—already safeguard those interests. Nevada's law adds a pre-circulation barrier unrelated to fraud or administrative integrity.

117.  Nothing in the First Amendment permits the State to bar a qualified Nevada elector from initiating legislation, merely because he resides outside the particular locality and is only one person. Such a regulation can't survive strict scrutiny.

118.  Residency-based classifications among natural-person electors are not required to ensure accountability or prevent outside influence.

119.  Prior holdings permitting an "official proponent" to be limited to an elector, did so in *materially different circumstances*, specifically where the plaintiffs seeking proponent status were **corporations or associations**. *Chula Vista Citizens v. Norris*, 782 F.3d 520 (9th Cir. 2015) upheld an elector requirement, only to prevent **non-human entities**, foreign corporations, and outside associations from proposing laws for communities in which they bear no civic responsibility.

120.  *Chula Vista* did **not** approve residency-based restrictions among natural persons, nor did it approve **numeric sponsorship thresholds**. The concerns animating *Chula Vista*—foreign influence, non-resident corporations, and outside associations proposing local laws—are wholly absent here.

121.  Plaintiff, as a natural-person Nevada elector, does not fall within any category the *Chula Vista* court described as potentially harmful.

122 .  Accordingly, Plaintiff alleges that the five-sponsor requirement is not narrowly tailored, imposes a severe pre-circulation burden on core political speech, and is unsupported by

16

precedent addressing natural persons' rights to initiate legislation. Nevada's law therefore violates the First Amendment.

**C. Nevada's Five-Sponsor Requirement Is Unique as a Statewide Mandate and Improperly Supplants the Actual Grassroots Test: the 15% Signature Threshold**

123. Lastly, Nevada's 5 local sponsor rule is an election barrier that no other **statewide** system imposes.

124. This requirement does not measure grassroots support; it measures the willingness of a small handful of individuals to expose themselves publicly *before* any voter interaction occurs.

125. Plaintiff's research identified only a handful of *isolated municipal charters* outside Nevada—Los Angeles, California[1]; St. Marys, Pennsylvania[2]; and the Minnesota charter cities of Hutchinson and Ramsey[3]—that use similar five-person local committee structures. But these provisions (1) are **city-specific**, not statewide; (2) arise from **local home-rule authority**, not state statute; (3) do not bar nonresidents from initiating in other jurisdictions; and (4) do not combine Nevada's additional ban on circulation until all five locals are obtained. No other state has transformed this local model into a universal, mandatory, statewide rule.

126. These details are important to note because when *Angle* analyzed Nevada's All Districts Rule, it found that half of the states that allow initiatives, have a geographic distribution rule and thus Nevada articulated an "important regulatory interest." *Angle v. Miller,* 673 F.3d 1122 (9th 2012).

127. The same can't be said for Nevada's Five Person Sponsor Rule because, as shown above, Nevada is the only state with a state statute mandating 5 sponsors for local measures.

---

[1] Los Angeles Election Code 705 (https://clerk.lacity.gov/sites/g/files/wph1491/files/2021-10/Election_Code_0.pdf#:~:text=Proponents%20of%20Initiative%20Petitions,voter%20registration%20records%2C%20and%20designating)
[2] St. Mary's, PA Code (https://ecode360.com/15784168#:~:text=Any%20five%20registered%20voters%20may,Separate)

[3] Hutchinson, MN Code (https://codelibrary.amlegal.com/codes/hutchinson/latest/hutchinson_mn/0-0-0-58)

128.  The five-sponsor requirement also operates at a fundamentally different procedural stage than the regulations examined in *Angle*. *Angle* dealt with a **post-filing** distribution rule requiring signatures to be gathered across congressional districts.

129.  Crucially, proponents in *Angle* were *already permitted to circulate* their petition and collect signatures. The burden evaluated there concerned *how* signatures must be distributed—not whether circulation could begin at all.

130.  Under NRS 295.095(1) and 295.205(1), Plaintiff may not collect a single signature—despite voter willingness—unless he first persuades four additional local residents to publicly identify themselves as sponsors.

131.  This barrier arises *before* the signature stage that *Angle* relies upon to measure grassroots support.

132.  As a result, Nevada's system blocks initiatives for reasons unrelated to voter sentiment, replacing the 15% signature test with a threshold based on personal risk tolerance of a few private residents

133.  The Supreme Court and Ninth Circuit have repeatedly held that **signatures** are the measure of local support. *Angle*'s entire rationale for allowing geographic distribution requirements,  rests on the premise that voters must have the opportunity to express support through signatures. Nevada already accomplishes this through its 15% threshold.

134.  The five-sponsor rule does not supplement this test—it **supplants** it, preventing voters from expressing any support at all unless a five-person committee is first assembled.

135.  Plaintiff's experience demonstrates how the statutes suppresses controversial, local initiatives.

136.  Plaintiff seeks declaratory relief that NRS 295.095(1) and NRS 295.205(1) unconstitutionally burden core political speech by imposing a pre-circulation sponsorship requirement that functions as a severe First Amendment barrier.

137.  Plaintiff seeks injunctive relief preventing enforcement of the five-resident sponsorship rule so that he may file and circulate local his planned initiative petitions.

### Count II – Equal Protection (U.S. Const. amend. XIV)

138. Plaintiff incorporates by reference paragraphs 1–137.

139. The Equal Protection Clause requires that similarly situated individuals be treated alike, unless the State can show that differential treatment is narrowly tailored to a compelling governmental interest. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

140.  Nevada law arbitrarily distinguishes between two identical forms of direct democracy: statewide initiatives and local initiatives. A single elector may sponsor a statewide petition under NRS 295.015(1), but at least five *local* electors are required to sponsor a city or county petition under NRS 295.095(1) and NRS 295.205(1).

141.  There is no constitutional or practical distinction that justifies treating statewide and local initiative sponsors differently. Both processes invoke the same fundamental right reserved to Nevada citizens under Article 19, yet the burdens imposed on the local process are substantially heavier.

142.  These statutes further discriminate among Nevada electors by conditioning the ability to sponsor a petition on residency *within the particular city or county*, even though the elector is fully qualified to sign, vote on, or sponsor statewide measures. Thus, a Nevada resident may lawfully be the sole sponsor of a statewide constitutional amendment, but is categorically prohibited from sponsoring a local measure, unless he (a) lives in that specific locality and (b) recruits four additional local electors willing to publicly affiliate with the measure.

143.  This residency-based burden falls hardest on initiatives involving subject matter that is stigmatized or controversial—such as brothel regulation, abortion access, or other socially "sensitive" topics—where community members privately support reform, but are unwilling to attach their names publicly for fear of reputational retaliation, harassment, or social

consequences. The result is a *dramatic shrinking* of the pool of individuals able or willing to serve as sponsors.

144. By allowing a single Nevada elector to initiate statewide lawmaking, while denying that same elector the ability to initiate local lawmaking solely on the basis of city/county boundaries, Nevada has drawn an irrational and invidious classification among equally situated electors. This classification burdens a fundamental political right and therefore demands strict scrutiny.

145. The Ninth Circuit has made clear that States may not adopt classifications that unjustifiably circumscribe political participation. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966). In *Chula Vista,* the court upheld the elector requirement **specifically in the context of preventing corporations and artificial entities** from controlling local initiatives. 782 F.3d 520 (9th Cir. 2015). But the Ninth Circuit emphasized that *natural persons*—qualified electors— represent a fundamentally different category, and that restrictions designed to keep out non-electors do not justify burdening citizens who are already qualified Nevada electors.

146. Unlike the corporate-control concerns in Chula Vista, Nevada's five-person local sponsor rule burdens only *natural persons* and offers no comparable justification.

147. Courts across the country have repeatedly held that residency-based and threshold restrictions on initiative participation severely burden political rights and trigger strict scrutiny. See Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 197–99 (1999); *Nader v. Brewer*, 531 F.3d 1028, 1035–39 (9th Cir. 2008) (striking Arizona's residency requirement because it severely limited the pool of eligible circulators and thus the "quantum of political speech"); *Chandler v. City of Arvada*, 292 F.3d 1236, 1241–44 (10th Cir. 2002) (holding city residency requirements unconstitutional because they significantly restrict political participation and are not narrowly tailored).

148. Nevada cannot demonstrate a compelling interest for requiring *five* local sponsors to initiate a local petition while allowing *one* sponsor to initiate a statewide petition. The State's

probable asserted interests—fraud prevention, administrative clarity, or ensuring local accountability—are already fully addressed by existing measures: sworn circulator affidavits, signature verification, criminal penalties for fraud, and the fact that only *local voters* can ultimately approve the measure anyway.

149.  Because NRS 295.095(1) and NRS 295.205(1) impose a severe burden on a fundamental political right, discriminate among Nevada electors without adequate justification, and are not narrowly tailored to any compelling interest, they violate the Equal Protection Clause of the Fourteenth Amendment.

150.  Plaintiff seeks declaratory and injunctive relief holding that the five-sponsor and local-residency requirements for initiating local initiatives are unconstitutional as applied to Nevada electors.

### Count III – Nevada Constitution, Article 19

151.  Plaintiff incorporates by reference paragraphs 1–150.

152.  Article 19 of the Nevada Constitution reserves the initiative power directly to the people and expressly provides that this right is self-executing, requiring no legislative action or governmental permission to become operative.

153.  Because the initiative power is self-executing, the Legislature's authority under Article 19 is strictly limited to enacting **reasonable** procedural regulations that **facilitate** the exercise of the right, and may not impose substantive conditions that restrict, impair, or condition access to the initiative power itself.

154.  Although Article 19, Section 5 authorizes the Legislature to "provide by law for procedures to facilitate the operation" of the initiative process, the Nevada Supreme Court has made clear that this provision does not grant the Legislature unlimited authority to regulate the initiative power, nor does it permit enactments that directly inhibit or restrict the people's reserved rights.

21

155.  In the Nevada Supreme Court case of *People ex rel. Angle v. Miller*, the Nevada Supreme Court held that Article 19, Section 5 must be read in harmony with the Constitution's self-executing reservation of initiative power, and that legislative enactments are permissible **only insofar as they facilitate—rather than impair—the initiative process**. The Court expressly rejected the argument that Section 5 authorizes procedural requirements that "directly inhibit the initiative process" or "unreasonably reduce the people's ability to exercise their initiative rights." *People ex rel. Angle v. Miller*, 192 P.3d 1166 (NV 2008).

156.  The statutory requirement that at least five local electors agree to serve as sponsors before a city or county initiative petition may be circulated, functions not as a neutral procedural regulation, but as a **substantive gatekeeping device** that determines whether the initiative process may begin at all.

157.  This five-sponsor threshold does not regulate the mechanics of signature verification, filing deadlines, or ballot placement. Instead, it only complicates and conditions access to the initiative process, thereby preventing initiatives from ever reaching the circulation stage and foreclosing voter participation entirely.

158.  By requiring five people to publicly agree to serve as sponsors before a local initiative may even begin, the Legislature effectively prevents the exercise of a constitutional right at the outset and is inconsistent with Article 19's self-executing nature and the Nevada Supreme Court's instruction that legislative procedures may not directly inhibit or restrict the initiative power.

159.  The constitutional defect is further underscored by Nevada's disparate treatment of statewide initiatives, which may be initiated by a single sponsor. Nothing in the text, structure, or history of Article 19 authorizes the Legislature to impose **greater initiation burdens on local initiatives** than on statewide initiatives, particularly where the same constitutional right is being exercised.

22

160.  By conditioning the exercise of the initiative power on the agreement of five local electors—rather than on the will of the electorate as expressed through signature gathering—NRS 295.095 and NRS 295.205 impermissibly narrow, burden, and impair the initiative right guaranteed by Article 19 of the Nevada Constitution.

161.  Accordingly, the five-sponsor requirement and local residency rule set forth in NRS 295.095 and NRS 295.205 violate the plain language, structure, and purpose of Article 19 and are invalid under the Nevada Constitution as applied to the initiation of local initiative petitions.

### Count IV – 42 U.S.C. § 1983

162.  Plaintiff incorporates by reference paragraphs 1–161.

163.  Defendants, acting under color of state law, enforce Nevada statutes that deprive Plaintiff of his rights under the First and Fourteenth Amendments of the U.S. Constitution.

164.  Plaintiff is entitled to relief under 42 U.S.C. § 1983, including declaratory and injunctive relief, as well as attorney's fees pursuant to 42 U.S.C. § 1988(b).

### PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

A. Declare that the five-person sponsor threshold and local residency requirement set forth in NRS 295.095(1) and NRS 295.205(1), as applied to the initiation of local initiative petitions, violate the First and Fourteenth Amendments to the United States Constitution and Article 19 of the Nevada Constitution;

B. Enjoin Defendant from enforcing the five-person sponsor threshold and local residency requirement, set forth in NRS 295.095(1) and NRS 295.205(1), as applied to the initiation of city and county initiative petitions

C. Order that one sponsor, regardless of where he resides within Nevada, may initiate a local petition;

D. Award Plaintiff costs and attorney's fees under 42 U.S.C. § 1988;

E. Grant all other relief as this Court deems just and proper;

F. Resolve this matter on an *expedited basis,* ideally by **March 2026**, so that Plaintiff and

23

other voters may begin gathering signatures to qualify for the November 2026 general election.

Respectfully submitted


DATED:  March 10th, 2026



Russell Greer
/rgreer/
Pro Se


*Note: Plaintiff has training and experience as a paralegal and is therefore familiar with legal research, drafting, and procedure. Plaintiff is fully capable of representing himself and brings this action in good faith.*

**EXHIBIT A**

**UNR Student Volunteers**





**EXHIBIT B**

**UNR Call Logs**







| | | H |
|---|---|---|
| | | Notes |
| | | |
| | | Send her email; she seemed interested but said she wanted to look over it herself: alys... |
| | | beeping when called |
| | | asked for person who deals w/ donations, left message w/ "Tammy" |
| | | Sent to HR voicemail, left message |
| | | |
| | Party | call picked up, very muffled, couldn't understand/didn't know if someone was on other end |
| | Party | spoke spanish to me |
| | Party | voicemail box not set up |
| | Party | beeping when called |
| | Party | voicemail box not set up |
| | Party | voicemail box not set up |
| | Party | voicemail box not set up |
| | Party | left message |
| | Party | left message |
| | | |
| | | answered, hung up |
| | | left message |
| | an | left message |
| | an | beeping when called |
| | | No longer Fermin's number |
| | an | left message |
| | an | left message (same # as above #28) |
| | | call cannot be completed |
| | an | went to "google assistance" and just keep repeating itself |
| | an | left message |
| | | call cannot be completed |
| | | beeping when called |
| | an | doesn't live in Nevada anymore, so no |
| | | said no |
| | an | left message |
| | an | left message |

Sheet1 ▾



6:30

.ıll 5G 46

**Back Tap**
Double Tap Detected

X

### Chiara West Wendover — 4-12-22

Type
Google Sheets

Location
My Drive

Size
2 KB

Storage used
2 KB

Owner
A Safer Nevada Director

Created
4/11/22 by A Safer Nevada Director

Modified
6/3/22 by A Safer Nevada Director

Manage access

A

Activity

6:31

5G 45

Back Tap
Double Tap Detected

| | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|
| | | | | Music playing, went on for more than 2 minutes | | | |
| | | | | | | | |
| | | | | not interested | | | |
| | | | | Left message | | | |
| | | | | Wants to do some research on their own and will call us back if they're interested | | | |
| | | | | hung up | | | |
| | | | | not a working number | | | |
| | | | | not a working number | | | |
| | | | | not a working number | | | |
| | | | | Couldn't take call | | | |
| | | | | EMAIL: emq@frontiernet.net | | | |
| | | | | Left message | | | |
| | | | | Left message | | | |
| | | | | not a working number | | | |
| | | | | left message | | | |
| | | | | Email: johnellison@elko.com | | | |
| | | | | Mailbox full | | | |
| | | | | Left message | | | |
| | | | | not interested | | | |
| | | | | Left message | | | |
| | | | | Immediately went to voice mail, left message | | | |
| | | | | not interested | | | |
| | | | | left message | | | |
| | | | | hung up | | | |
| | | | | Left message | | | |
| | | | | Left message | | | |
| | | | | Not a working number | | | |
| | | | | EMAIL: info@newecannabis.com | | | |
| | | | | not interested | | | |
| | | | | Not a working number | | | |
| | | | | Left message | | | |
| | | | | left message | | | |
| | | | | Left message | | | |
| | | | | | | | |
| | 89883 | 7754095769 | Non-Partisan | Wanted my info and he will get back, gave him your email | | | |
| | 89883 | 4354969062 | Democrat | Said will call back in a few minutes, never did | | | |
| | 89883 | 7753859294 | Non-Partisan | Call cannot be completed at this time | | | |
| | 89883 | 4352288035 | Democrat | Call cannot be completed at this time | | | |
| | 89883 | 7758351966 | Non-Partisan | Left message | | | |
| | 89883 | 3852387058 | Democrat | Couldn't understand/hear, there was a noise in the background | | | |
| | 89883 | 4352241822 | Non-Partisan | Left message | | | |
| | 89883 | 4358303156 | Democrat | Left message | | | |
| | 89883 | 3852459499 | Non-Partisan | Left message | | | |
| | 89883 | 7024702461 | Non-Partisan | Hung up, got a little mad | | | |
| | 89883 | 4358411378 | Non-Partisan | Voice mailbox not set up, couldn't leave message | | | |
| | 89883 | 7753889484 | Independent American Party | Left message | | | |
| | 89883 | 7753400180 | Non-Partisan | Call cannot be completed at this time | | | |
| | 89883 | 4356950636 | Non-Partisan | said will contact me back if she is interested | | | |
| | 89883 | 8012437490 | Non-Partisan | Left message | | | |
| | 89883 | 8018642434 | Non-Partisan | Hung up on me | | | |
| | 89883 | 8018643899 | Democrat | left message | | | |
| | 89883 | 7753409252 | Non-Partisan | Mailbox full | | | |
| | 89883 | 7752253477 | Non-Partisan | No answer | | | |
| | 89883 | 4352258585 | Non-Partisan | Hung up | | | |
| | 89883 | 4354066267 | Non-Partisan | Said yes, same address, EMAIL: carrillo32301@gmail.com | | | |
| | 89883 | 4352377722 | Non-Partisan | Hung up | | | |
| | 89883 | 8015029825 | Non-Partisan | left message | | | |
| | 89883 | 8015505506 | Non-Partisan | Hung up | | | |
| | 89883 | 7252770946 | Democrat | Left message | | | |
| | 89883 | 4352770843 | Non-Partisan | Hung up, was in area meetings | | | |
| | 89883 | 4354969843 | Democrat | Texted 3-17-24 | | | |
| | 89883 | 4243868587 | Democrat | Texted 3-17-24 | | | |
| | 89883 | 4352491770 | Non-Partisan | Left message | | | |
| | 89883 | 7754080211 | Non-Partisan | Left message | | | |
| | 89883 | 4354066901 | Non-Partisan | Texted 3-17-24 | | | |
| | 89883 | 7753403215 | Non-Partisan | Texted 3-17-24 | | | |
| | 89883 | 4242495716 | Non-Partisan | Same number as Kristina | | | |
| | 89883 | 4242495716 | Non-Partisan | Texted 3-17-24 | | | |
| | 89883 | 9168494471 | Non-Partisan | Texted 3-17-24 | | | |
| | 89883 | 2084901244 | Non-Partisan | Texted 3-17-24 | | | |
| | 89883 | 8018251721 | Non-Partisan | Texted 3-17-24 | | | |
| | 89883 | 4358508608 | Non-Partisan | Texted 3-17-24 | | | |

Sheet1





35

**EXHIBIT C**

**12/12-12/13/2023 Emails to Winnemucca Residents**







**From:** A Safer Nevada Director contact@asafernevada.org
**Subject:** Winnemucca Ballot Initiative
**Date:** Dec 12, 2023 at 8:00:48 PM
**To:** [redacted]
**Bcc:** contact@asafernevada.org

Dear Bill,

I was reaching out because your email was listed on the Nevada Secretary of State website for your past candidacy in Winnemucca and I wanted to see if you would help support our 2024 ballot initiative.

ASN is a non-partisan organization that advocates for Nevada brothels. We were featured on the Vegas news in June: https://www.8newsnow.com/investigators/effort-underway-to-legalize-brothels-across-nevada-las-vegas/ .

Next year, we will be doing a ballot initiative in Winnemucca. As you may know, brothels are technically legal in Winnemucca, but none currently operate because a greedy monopolist owns the only available lots for it. Our ballot initiative proposes zoning new areas for brothels, which makes sense if you think about it because no other "vice business" (like casinos, cannabis, etc) is regulated to only one designated block — and no business should be designated to one block because of Winnemucca's current situation. Some people just can't play fairly.

We need 5 Winnemucca registered voters to sign a petition so that signature collecting can begin in 2024 to collect signatures to place this on the November 2024 election ballot.

Would you kindly sign the petition and find four other people to sign? The form would be relatively private. Happy to send it.

Thank you and I hope to talk soon

Russell Greer

A Safer Nevada

contact@asafernevada.org
www.asafernevada.org

**EXHIBIT D**

**Emails to Local PACS for Networking**



**6:26** ☾                                      ..ıl 5G 49

◀ Files

**Re**quest...

From: **A Safer Nevada Director** contact@asafernevada.org
Subject: **Request for Support with Brothel Legalization Ballot Initiative**
Date: **Jul 23, 2023 at 1:03:31 PM**
To: k▮▮▮▮▮▮▮▮▮▮il.com
Bcc: **contact@asafernevada.org**

Dear Kim,

I write to you today because you lead a Battle Born Women, a PAC that supports helping candidates get elected. I wanted to write you to see if there was any support you could lend towards my ballot initiative campaign, even if it was just networking connections?

My name is Russell and I'm a disabled man running a campaign to expand legal brothels in Nevada in 2024. Every human deserves intimacy and the way the current system is, it's flawed in so many ways, one being that the brothels aren't legal in places where tourists are and so expanding would help create a safer Nevada and help protect the women in sex work, hence the name of the PAC. I was featured on the Channel 8 Vegas news last month: https://www.8newsnow.com/investigators/effort-underway-to-legalize-brothels-across-nevada-las-vegas/

My campaign will be running ballot initiatives in West Wendover, Lincoln County and Churchill, which I would be financing myself, since donors are hard to find, though we have received donations here and there. If we can get enough donations, we want to also try doing larger ballot initiatives in Washoe, Douglas and Carson City. Vegas is off the tables, due to a state law that would require a state wide effort to over turn, however, this 2024 run will be a test to see if a state-wide effort is possible in 2026 to legalize Vegas.

The support I'm needing is mostly connections. I'm seeing if you would like to help with this? If not, if you may know of anyone who would like to help with this, such as a campaign partner to help me reach out to voters and donors, etc?

I would love to talk more.

Warm regards,

**Russell Greer**

A Safer Nevada
contact@asafernevada.org
www.asafernevada.org

     

42

**EXHIBIT E**

**Sending Affidavits to M for Her Alleged Contacts to Sign**



From: **A Safer Nevada Director** contact@asafernevada.org
Subject: **County affidavits**
Date: **Aug 1, 2023 at 8:45:23 PM**
To:
Bcc: r███████████r.c██m, contact@asafernevada.org

Hi, Ma█████

It's Russell, with A Safer Nevada. We talked on FB. Thank you so much for helping us with this.

Please find attached the 6 county forms.

Please make sure that the 5 people who sign each form live in that county and are registered voters. For instance, Washoe residents sign Washoe forms, etc. Don't worry about the notary part. I was informed that isn't required.

I also included links to the actual proposed ordinances that ASN drafted and our lawyer proofread:

Lincoln County:

https://www.scribd.com/document/661921422/Lincoln-Proposed-Ordinance

Carson City:

https://www.scribd.com/document/661921641/Carson-City-Proposed-Ordinance

West wendover

https://www.scribd.com/document/661921741/West-Wendover-Proposed-Ordinance

Washoe

https://www.scribd.com/document/661921878/Washoe-County-Proposed-

Ordinance

Douglas

https://www.scribd.com/document/661922044/Douglas-Proposed-Ordinance

Churchill

**EXHIBIT F**

**Canvassing Voters on Facebook (Circa. 2022-2023)**



11:17 ☾    ‧ıl 5G 🔋

‹ 1    Back Tap
Double Tap Detected

Lives in West Wendover, Nevada

Add friend    Profile

JUN 3, 2022 AT 10:04 AM

Hi, Shelley.

I'm reaching out to you because you live in West Wendover.

I'm with a social welfare group seeking to legalize sex work in West Wendover.

We need 5 WW residents to help us launch this and help us get 150 signatures before July 1st.

I was wondering if you would like to be one of the five people to join our committee. You wouldn't have to say anything and we would pay you 50 dollars for sitting on the committee. Please let me know by June 10th.

Aa

45



11:17

.ull 5G 44


esca Yeann

OCT 23, 2023 AT 1:14 AM

Hey, Jesca. I wanted to connect with you because you are an admin for Nevada progressive Dems. My organization is seeking to expand brothels into various counties, including Washoe.

We are looking for people to help us and I was wondering if you would be interested? What we really need is 5 people to sign a notice saying they support this initiative, that we would then file with the county

46





**EXHIBIT G**

**Connecting with "H" on 8-11-22**



**EXHIBIT H**

**Email to West Wendover mayor telling her the 5 person rule is unrealistic (June 2024)**



6:16 ◐

◀ Files

**Back Tap**
**Double Tap Detected**

From: **A Safer Nevada Director** contact@asafernevada.org
Subject: **Re: Requesting Support with Brothel Ballot Initiative**
Date: Jun 27, 2024 at 3:15:40 PM
To: Jasie Holm ma

Mayor Holm,

I understand you're not Daniel. Would you help me understand why you don't want brothels in your city, when every incorporated city in Elko County has them?

I feel any subjective moral concerns are outweighed by the revenue benefits and the safety benefits for tourists and women in Utah who could come over to a safe, legal place. I used to live in Salt Lake City and WW is more reasonable to drivr to than Wells.

But alright. I guess 2026 will definitely have to be the year. I had a girl named Amanda. She rudely disappeared.

Russell Greer

A Safer Nevada
contact@asafernevada.org
www.asafernevada.org

On Jun 27, 2024, at 12:30 PM, Jasie Holm < > wrote:

Russell,

The bottom line is I am not Daniel. I spoke with him yesterday and he recalls this differently. I also didn't make the state laws you find unrealistic. Your desire to have brothels in West Wendover is exactly that, your desire not mine. Have a good day!

On Thu, Jun 27, 2024 at 7:44 AM A Safer Nevada Director

<contact@asafernevada.org> wrote:
So with this forwarded to you, is there a time that I can talk to you on the phone?

I didn't fall short. State law just has an unrealistic expectation of requiring 5 voters to publicly list their names on an affidavit to even jumpstart the process.

I grew up in a small town so I realize people talk and gossip.

Thanks



A Safer Nevada
contact@asafernevada.org
www.asafernevada.org

On Jun 27, 2024, at 12:30 PM, Jasie Holm <m████████████om> wrote:

Russell,

The bottom line is I am not Daniel. I spoke with him yesterday and he recalls this differently. I also didn't make the state laws you find unrealistic. Your desire to have brothels in West Wendover is exactly that, your desire not mine. Have a good day!

On Thu, Jun 27, 2024 at 7:44 AM A Safer Nevada Director



<contact@asafernevada.org> wrote:
So with this forwarded to you, is there a time that I can talk to you on the phone?

I didn't fall short. State law just has an unrealistic expectation of requiring 5 voters to publicly list their names on an affidavit to even jumpstart the process.

I grew up in a small town so I realize people talk and gossip.

The only way this can happen is an advisory questoon which Daniel promised.

You already have cannabis and casinos. I fail to see why voting on brothels is any worse than cannabis, especially when every city in your county has one.

Thanks

Russell Greer

A Safer Nevada
contact@asafernevada.org
www.asafernevada.org

On Jun 25, 2024, at 10:01 PM, A Safer Nevada Director
<contact@asafernevada.org> wrote:

Mayor Holm,

I am forwarding this to you.

This is my conversation with Daniel from 2022. His own words are below where he even says to come back to the city to do the advisory question.

**EXHIBIT I**

**Communication with the Club**



Hey,

I love the color! The signature number is 140,777 valid signatures.

We can definitely pull this off. It's not "if", it's just acquiring the resources and support. Again, a donation of 20 dollars isn't too much to ask for and it's only benefiting them. For instance, if money was ever involved at all, even not paying for sex, or whatever, decriminalization would remove any innocent mistatement resulting in a criminal charge.

Or heck: if one of your members really likes sex and wanted to one day make extra money doing what she does for money, what is stopping her, besides the laws? Nobody has demonstrated to me how money changes the difference with recreational sex. Sure, a sex worker might see people they normally wouldn't see under unpaid circumstances, but again: that's where cc        agrees to see w.       /ith decrimina.      n, she also has the right to turn down

**EXHIBIT J**

**Email to Tyler with the student club**



58

**EXHIBIT K**

**Email to Libertarian Party on 8-1-21; they replied later saying they're tight on funds to assist; also spoke to the LP of Los Angeles, but could never reach Nevada LP**



7:21

.ıll 5G 73

Back Tap
Double Tap Detected

P. O. Box
Las Vegas, NV 89114
United States
Map It

**Message**

08/01/21

Dear Libertarian Party,

My name is Russell and I am the Executive Director of A Safer Nevada. We are a state-registered political action committee that was created to put a question on the Nevada 2024 ballot to decriminalize prostitution.

Although Nevada has legal brothels, they just don't work.
Decriminalizing sex work is supported by many organizations, such as the ACLU and UNAIDS. Your party supports decriminalizing sex work and that's why we contact you.

We reach out to your party with the hope that you can support us.

The support we are looking for is in three areas:

1. If your organization has an email blast list, we would love to have your organization put our donation page on your blast list for subscribers to donate $20.00 to. www.asafernevada.org/donate

Also, we would love a shout out on your social media and website.

2. We would appreciate if any volunteers within your organization would like to help us fund raise, through phone calling.

3. And lastly, we would be grateful if your organization would make a donation in the amount of $5,000 to help support us. Donations can be made on our secure website at: www.asafernevada.org/donate

We would appreciate your support in any or all of the ways mentioned. Let's put our libertarian policies into practice!

hear from you.

Russell Greer



**EXHIBIT L**

**Emailed and Chatted with Former Director of the ACLU of Nevada about Helping with Initiatives. She Later Left the ACLU**





**EXHIBIT M**

**Esmeralda Agenda Placement (2024)**



**EXHIBIT N**

**Nevada SOS Website Screenshot – Petition C-07-2026 Court Challenge (2026)**

C-06-2026
Received: January 7, 2026
Withdrawn: January 8, 2026
Protect Girls' Sports PAC
Financial Impact Statement
Notice of Intent to Circulate Petition
Withdrawal

C-07-2026 - **Challenged in the First Judicial District Court on 1/29/2026. Hearing held on 2/20/2026. Order issued 2/25/2026: Granted in part/Denied in part. Description of Effect amendment required; petition refiling occured on 2/26/2026.**

Received: January 8, 2026
Protect Girls' Sports PAC
Financial Impact Statement
Notice of Intent to Circulate Petition

**Initiative Petitions to Propose a New Statute or to Amend an Existing Statute**

*Statutory Initiative Petitions may be filed not earlier than January 1, 2026. If the following petitions gather the sufficient signatures, they are transmitted to the Legislature on the first day of the 2027



**EXHIBIT O**

**"A" saying she would find 4 other people**





**EXHIBIT P**

**Felonious Threats from Elijah Edwards**

From: Russell Greer RussMark@gmail.com
Subject: Re: Your support for Russell Greer and Prostitution
Date: Dec 24, 2025 at 7:20:29 PM
To: Elijah Edwards elijahedwards540@gmail.com
Cc: Waylon Huber waylon@robinhoodrealtynv.com

Hi Elijah

This is felony stalking. I have no idea who you are. I have no idea why you're doing this to me.

Please rest assured that I am taking this to the police. I am pursuing charges. This is going to end with you in hand cuffs.

I am well aware you are from the kiwi farms stalking site. If I can get one of your fuckers in handcuffs, maybe this shit will end.

Sent from my iPhone

On Dec 19, 2025, at 11:31 AM, Elijah Edwards <elijahedwards540@gmail.com> wrote:

We are watching you two. All your families, friends, coworkers and neighbors are being contacted to tell them about your prostitution activities.

On Fri, Dec 12, 2025 at 11:59 PM Elijah Edwards <elijahedwards540@gmail.com> wrote:
Hello Waylon,

It has come to my attention that you have been engaging in business with a man named Russell Greer for the purposes of opening up brothels and financially supporting the business of prostitution. If you continue down this path, you will regret it for the rest of your life. Russell Greer is convicted of harassing and stalking women, we have his criminal record.

Furthermore, do you have daughters? Would you want them working in a brothel? But you're happy to sell other men's daughters into prostitution? There is a special place for this kind of immorality. I urge you to find Jesus for your own soul and salvation, in this life and the next.

I'm part of a group against the exploitation and sex-trafficking of young women in Nevada and we will ensure everyone in Winnemucca, Elko, and the broader Nevada area know of you, Waylon Huber, and what you intend to do with our daughters. All our actions will be legal, we will be shining a spotlight on the actions of you and Mr. Greer to the community, press, and social media. Choose your future carefully.

God bless,
Eli